**Richard CARMACK, d/b/a Carmack Elk Farm, et al., Appellant,**

v.

**MISSOURI DEPARTMENT OF AGRICULTURE, et al., Respondent.**

**No. WD 57199.**

Missouri Court of Appeals, Western District.

Aug. 8, 2000.

Motion For Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 2000.

Application for Transfer Denied Dec. 5, 2000.

Gwendolyn S. Froeschner, Columbia, for appellant.

Christie A. Kincannon, Jefferson City, for respondent.

Before BRECKENRIDGE, P.J., LOWENSTEIN and ELLIS, JJ.

PATRICIA BRECKENRIDGE, Judge.

Richard Carmack, part owner and operator-agent for all owners of Carmack Elk Farm, appeals the trial court's refusal to grant his petition for writ of mandamus and the court's judgment in which it declared, pursuant to § 267.610, RSMo 1986,[1] the actual value of Mr. Carmack's slaughtered elk for indemnification purposes. This court finds that (1) the trial court correctly concluded that an appraisal of the elk's actual value pursuant to § 267.610 must take into consideration the fact that the elk were exposed to or infected with tuberculosis; (2) the trial court misapplied the law in when it adjudicated the actual value of the slaughtered elk, since Mr. Carmack was entitled to the appraisal procedure in § 267.610 to establish the actual value of the elk; and (3) Mr. Carmack's claim that the trial court erred in refusing to grant his request for writ of mandamus need not be addressed. The judgment of the trial court is affirmed, in part, and reversed, in part, and the cause is remanded.

**1.** All statutory references are to the Revised Statutes of Missouri 1986, unless otherwise indicated.

### Factual and Procedural History

Carmack Elk Farm is an alternative agriculture elk farm located in Howard County. The operation started in 1990, when Mr. Carmack and his partners first imported thirty-four elk from Canada. At that time, the elk were tested and certified to be free of disease. In November of 1991, however, Mr. Carmack and the Department of Agriculture (the Department) learned that the Canadian herd from which Mr. Carmack had purchased his elk might be infected with tuberculosis.

The Department began testing Mr. Carmack's entire herd, which by then consisted of fifty-two elk, for bovine tuberculosis. Eleven of the elk tested responded positively to tuberculosis on the initial test, a Single Cervical Test (SCT). The Department quarantined Mr. Carmack's herd, and decided to perform another test, the Comparative Cervical Test (CCT), on the eleven elk which were responders on the SCT. Six of the eleven elk responded positively to tuberculosis on the CCT. Although more accurate than the SCT, the CCT is not conclusive that an elk does, in fact, have tuberculosis. The only way to conclusively determine that an elk has tuberculosis is to sacrifice the animal and conduct a post-mortem examination. The state veterinarian, who is part of the Department, determined that the six elk that were responders on the CCT should be sacrificed so that a post-mortem examination could be performed.

After the state veterinarian determined that six of the Carmack elk needed to be slaughtered, the Department and Mr. Carmack began discussing the proper indemnification from the State for the six elk. Section 267.610.1 provides that once the state veterinarian determines that livestock, animals, or birds must be slaughtered in order to control and eradicate "a highly contagious or communicable or infectious disease" and notifies the owner of

that fact, the livestock, birds or animals shall then be appraised and slaughtered. The appraisal is to be made jointly by the owner and a representative of the Department; however, if the owner and the Department disagree, a "disinterested third party shall be called in and a majority decision as to the appraisal of such livestock shall be fixed:" Section 267.610.2. The statute provides that the livestock, animals, or birds "shall be appraised at their actual value giving due consideration to breeding value as well as to dairy or meat value." Section 267.610.4.

The Department and Mr. Carmack disagreed as to the actual value of the six elk. The Department proposed setting three different values based upon where the six elk fell within these categories: (1) non-exposed to tuberculosis and non-infected; (2) exposed but non-infected; and (3) infected. Mr. Carmack, however, believed the actual value of the six elk was their market value, without considering whether the animals had been exposed to or infected with tuberculosis.

Because the Department and Mr. Carmack could not agree on an appraisal of the six elk, a third-party independent appraiser, who was selected by the Department and ultimately accepted by Mr. Carmack, was asked to provide an appraisal. Dr. James E. Knight, a wildlife specialist, valued the six elk at $7,650.58 each, and valued male calves in utero at $1,000 and female calves in utero at $3,000. In his appraisal, Dr. Knight assumed the elk were healthy.

The Department disagreed with Dr. Knight's appraisal, and asked Dr. Knight to clarify what the actual value of an elk exposed to or infected with tuberculosis would be. Dr. Knight stated that he assumed the elk were healthy, because the value of an elk exposed to tuberculosis is zero. In Dr. Knight's opinion, no breeder would purchase elk from a herd in which any of the elk had tested positive for tuberculosis until the herd tested free of tuberculosis. Because there would be no

market for the elk until that time, Dr. Knight concluded that the elk would have no value. Dr. Knight also stated that elk which test positive for tuberculosis have no meat value. The Department then furnished Dr. Knight with a definition of "actual value" from *State v. Lindley*, 232 Mo. App. 831, 113 S.W.2d 132, 137 (1938), which the Department believed supported its definition of actual value. Nevertheless, Dr. Knight stated that he still believed the actual value of the six elk to be $7,650.58 each.

Mr. Carmack filed a petition for writ of mandamus in April of 1993. In his petition, Mr. Carmack sought payment pursuant to Dr. Knight's appraisal for the six elk identified by the state veterinarian to be destroyed, and for any future elk that the Department might destroy. After the filing, the parties agreed that the Department would pay Mr. Carmack $7,650.58 for each of seven elk—the six identified by the Department to be slaughtered plus one that the Department slaughtered by mistake. All issues pertaining to those seven elk were dismissed from the action.

While the petition for writ of mandamus was pending in the trial court, the legislature amended § 267.610 in June of 1993 to change the rate of indemnification. Pursuant to § 267.610.1, RSMo Cum.Supp.1993, the livestock, animals or birds were to be "indemnified within the limits of appropriation, at a rate fixed by rule or regulation promulgated by the director of the department of agriculture[.]" The amended statute stated that its provisions applied "to all cases to which the provisions of the section would otherwise apply which are settled after January 1, 1993." Section 267.610.2, RSMo Cum.Supp.1993.

In September of 1993, the trial court entered a judgment granting Mr. Carmack's petition for writ of mandamus. In its judgment, the trial court determined, *inter alia*, that the Department had to apply the terms of the 1986 version of § 267.610, rather than the 1993 version,

because the 1986 version was in existence on July 21, 1992, the date the Department quarantined the Carmack herd. Additionally, the court ordered the Department to discontinue the use of the three-tiered valuation system for indemnification pursuant to § 267.610, RSMo 1986. Both parties appealed the decision to this court.[2] In *Carmack v. Saunders,* 884 S.W.2d 394, 398 (Mo.App.1994), this court found that Mr. Carmack was not entitled to a writ of mandamus concerning the indemnification method for any future slaughters, as a writ of mandamus cannot be used to establish a right to future relief. This court reversed the trial court's judgment ordering the Department to apply the indemnification provisions of § 267.610, RSMo 1986, to all future slaughters and to discontinue the use of the three-tiered valuation system on all future slaughters.

Following the resolution of that appeal, Mr. Carmack filed a petition for declaratory relief in which he asked the court to declare unconstitutional House Bill 566, which contained the 1993 amendments to § 267.610. After the trial court found the bill constitutional, Mr. Carmack appealed to this court. The appeal was transferred to the Supreme Court. In *Carmack v. Director, Missouri Dept. of Agriculture,* 945 S.W.2d 956, 961 (Mo. banc 1997), the Supreme Court held that the 1993 amendment to § 267.610 addressed a different subject than the primary core subject of House Bill 566 and, therefore, violated the Missouri Constitution.

By the time the Supreme Court issued its opinion declaring the bill containing the 1993 amendment to § 267.610 unconstitutional, however, the state veterinarian had determined that it was necessary to slaughter forty-five more of the Carmack elk. Because the state veterinarian had obtained a definitive diagnosis of tuberculosis from the post-mortem examination of one of the initial seven elk slaughtered, the state veterinarian determined that it was necessary to administer the SCT on the remainder of Mr. Carmack's elk herd. Forty-five elk from the Carmack herd reacted positively to the SCT, and the Department proceeded with slaughtering those elk. Prior to the slaughter of those forty-five elk, Mr. Carmack contacted Dr. Knight and asked him to appraise his entire herd, which at that time, consisted of sixty-two elk. Dr. Knight appraised the total value of the sixty-two elk at $330,-482.62.

The Department did not agree to hire Dr. Knight to be a disinterested third party to appraise the forty-five elk it slaughtered or agree to pay Mr. Carmack the appraised value of those elk that Dr. Knight set forth in his appraisal of the entire herd. Instead, the Department paid Mr. Carmack $750 per head for the forty-five elk, as that was the rate of indemnification fixed by the Department pursuant to the 1993 amendment to § 267.610. The Department used the $750 figure because it was consistent with the amount the Department had paid for cattle infected with bovine tuberculosis, the same strain of tuberculosis to which the elk had been exposed or with which they had become infected. Mr. Carmack accepted the $750 per slaughtered elk under protest. By the time the last fourteen of the forty-five elk were slaughtered, the United States Department of Agriculture had implemented an indemnification program. Pursuant to the federal program, Mr. Carmack received an additional $750 per elk from the USDA on the last fourteen of the forty-five elk slaughtered.

In addition to receiving monetary compensation for the slaughtered elk, the Department also allowed Mr. Carmack to keep the meat of the slaughtered elk. Mr. Carmack entered into an arrangement with the Department in which he agreed to cover the expense of taking the elk to

---

**2.** Mr. Carmack's appeal concerned the discretion of the state veterinarian to identify which animals were to be slaughtered. Because the resolution of this issue is not relevant to the present appeal, this court will not recite it.

slaughter, which is usually borne by the Department pursuant to § 267.610.3, in exchange for the right to keep and use the meat. The Department agreed that no salvage value of the meat would be deducted from the indemnity payment Mr. Carmack received from the Department.

Mr. Carmack was able to use the meat of all slaughtered elk that did not have gross lesions. Mr. Carmack had the meat processed into sausage, and attempted to sell the sausage out of his home. In all, Mr. Carmack realized a total of 3,000 pounds of elk sausage, and he priced the sausage at $3 to $5 per pound. While Mr. Carmack was able to sell some of the sausage, he consumed a lot of it.

The Department released Mr. Carmack's elk herd from quarantine in April of 1997, after they no longer tested positive as responders for tuberculosis. Following the release of the quarantine, Mr. Carmack sold the remainder of his elk at auction for amounts ranging from $1,000 to $11,600 per animal.

In October of 1998, Mr. Carmack filed a petition for writ of mandamus and declaratory judgment. In his writ of mandamus count, Mr. Carmack asked the court to order the Department, among other things, to comply with the requirements of § 267.610 with regard to compensating him for the forty-five elk slaughtered for which he was compensated only $750, pay him statutory interest on the indemnification amount ordered for each elk from the date of slaughter, and pay his attorney's fees and court costs. In his declaratory judgment count, Mr. Carmack asked the court to order the Department to compensate him for the actual value of the forty-five elk slaughtered, giving due consideration to breeding value as well as dairy and meat value, in accordance with the provisions of § 267.610.

Following a trial, the trial court entered its judgment on Mr. Carmack's petition in March of 1999. In its judgment, the court concluded that § 267.610, RSMo 1986, is the applicable statute, and the term "actual value," as used in that statute, requires the appraisal to take into account the condition of the animal at the time of the appraisal, including any exposure to, or infection with, a disease. Pursuant to this interpretation of actual value, the court determined that after the Department had a definitive diagnosis of tuberculosis from the initial seven elk destroyed, any further appraisals should have considered the fact that the elk tested positively as responders to tuberculosis on the SCT and were part of a herd which had been exposed to tuberculosis. The court specifically stated that it rejected Mr. Carmack's assertion that the appraisal of a diseased animal which is zero would make § 267.610 meaningless. The court stated that the statute "was intended to apply to any number of situations, and the fact that an animal owner may receive no indemnification in one limited situation does not render the statute meaningless."

The court determined that the actual value of elk that test positive as reactors to tuberculosis on the SCT and have been exposed to tuberculosis is the value of their cooked meat. Using Mr. Carmack's testimony that he realized 3,000 pounds of meat from the forty-five elk destroyed and attempted to sell the meat at $5 per pound, the trial court concluded that Mr. Carmack appraised the actual value of the forty-five elk destroyed at $15,000 total. Based upon this figure, the court concluded that, by paying Mr. Carmack $750 per head, for a total of $33,750, the Department actually paid Mr. Carmack more than double Mr. Carmack's own appraisal of the elk's actual value.

The court also stated in its judgment that the Department could not be faulted for setting an indemnity amount for the forty-five elk destroyed pursuant to § 267.610, RSMo Cum.Supp.1993, because that was the version in effect at the time the indemnity amount was set and paid. Mr. Carmack filed this appeal. The disposition of Mr. Carmack's points is more

logical if the points are addressed out of order.

## Standard of Review of Declaratory Judgment

■ Mr. Carmack's second, third, and fourth points allege error in the court's declaratory judgment. This court reviews a declaratory judgment under the standard applicable to other court-tried cases. *Vocational Services, Inc. v. Developmental Disabilities Resource Board,* 5 S.W.3d 625, 629 (Mo.App.1999). This court will affirm the trial court's judgment regarding issues of fact unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). This court reviews questions of law *de novo. Id.*

## Trial Court Correctly Interpreted "Actual Value" Under § 267.610

In Mr. Carmack's third point, he alleges error in the trial court's interpretation of the term "actual value" in § 267.610. The trial court concluded that § 267.610 requires that the appraisal of the actual value of the elk take into consideration "the condition of the animal at the time of the appraisal, which includes any response to disease test, exposure to, or infection with disease." Mr. Carmack argues that the appraisal of the animal's "actual value," as it is used in § 267.610.4, should not take into account the animal's diseased status.

■ Resolution of the parties' disagreement over the interpretation of the term "actual value" requires this court to construe § 267.610. Statutory interpretation is an issue of law which this court reviews *de novo. Snyder v. Department of Elementary and Secondary Education,* 952 S.W.2d 764, 767 (Mo.App.1997). When construing a statute, courts must "ascertain the intent of the legislature from the language used and give effect to that intent, if possible, and to consider the words used in their plain and ordinary meaning." *Butler v. Mitchell–Hugeback, Inc.,* 895 S.W.2d 15, 19 (Mo. banc 1995). Only when language is ambiguous, or when it leads to an illogical result, may courts look past the plain and ordinary meaning of a statute. *State ex rel. Md. Heights v. Campbell,* 736 S.W.2d 383, 387 (Mo. banc 1987). The plain and ordinary meaning is generally derived from the dictionary. *Akers v. Warson Garden Apartments,* 961 S.W.2d 50, 53 (Mo. banc 1998).

■ Section 267.610.4 provides that the livestock "shall be appraised at their actual value giving due consideration to breeding value as well as to dairy or meat value." The dictionary definition of "actual" is "existing in fact or reality" and "in existence or taking place at the time." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 22 (1971). Applying this definition, the actual value of the livestock, animals or birds is their value as it exists in fact or reality at the time of the appraisal, giving due consideration to breeding, dairy or meat value. The timing of the appraisal is set forth in § 267.610.1. This section provides that when the state veterinarian determines that the slaughter method is necessary to control or eradicate a highly contagious or communicable or infectious disease among livestock, animals, or birds, the Department shall provide notice to the owner of the livestock, animals, or birds exposed to or infected with the disease, then an appraisal shall be made and the animals shall be destroyed. Thus, under the statute, at the time of the appraisal, the animals, livestock, or birds to be slaughtered have already been identified as having been either exposed to or infected with a highly contagious, communicable, or infectious disease.

■ Looking at the timing in this case, the state veterinarian made his determination that it was necessary to slaughter the forty-five elk after the initial seven elk were slaughtered and a conclusive diagnosis of tuberculosis in one of those initial

seven was made. The forty-five elk identified for slaughter were part of the same herd from which the conclusive diagnosis of tuberculosis had been made. Thus, the forty-five elk, as they existed in fact or reality at the time an appraisal should have been performed, had been exposed to tuberculosis.

Additionally, all of the forty-five elk slaughtered were, at the time of the state veterinarian's determination that their slaughter was necessary, "infected" with the disease as that term is defined in § 267.565(8). Although no conclusive diagnosis of tuberculosis can be made until after the animal is slaughtered and a post-mortem examination is performed, the statutory definition of "infected animal" requires only that an animal have "a positive reaction to any recognized serological test" or that the clinical symptoms and history simply justify designating the animal as being infected. Section 267.565(8). As all forty-five elk tested positive as reactors to the SCT, the elk were infected with tuberculosis at the time an appraisal should have been performed.

The plain and ordinary meaning of § 267.610 requires such a result. Because the appraisal occurs after the state veterinarian has identified those animals, livestock or birds exposed to or infected with a highly contagious, communicable or infectious disease, the animals, as they exist in reality at the time of the appraisal, are, in fact, exposed to or infected with the disease. Mr. Carmack argues that this interpretation leads to an absurd or illogical result because diseased animals have no market value. Without a market value, Mr. Carmack contends that the animals have no actual value and, therefore, § 267.610 is rendered meaningless. Section 267.610 does not require that actual value be based upon market value. Rather, the section requires that an appraisal of actual value give due consideration to breeding, dairy and meat value.

Mr. Carmack complains, however, that even if the appraisal considers the breeding, dairy and meat value, some of the elk may have an actual value of zero if the diseased status of the animal is taken into account. That such a result could occur in one of the many situations covered by the statute does not render the statute meaningless. If the legislature had intended to guarantee that owners receive compensation in every situation for the slaughter of livestock, animals, or birds exposed to or infected with a disease, the legislature would have provided for a set amount of reimbursement, rather than reimbursement based upon the appraised actual value. The trial court did not err in concluding that § 267.610 requires that the appraisal of the actual value consider the fact that the livestock, animals or birds are exposed to or infected with a highly contagious, communicable or infectious disease.

## Actual Value Must Be Set in Accordance with Appraisal Procedure in § 267.610

In his fourth point, Mr. Carmack claims that the trial court erred in concluding that the actual value of the forty-five elk slaughtered was the value of their cooked meat. Mr. Carmack also claims in this point that the trial court erred in concluding that his testimony as to the value of the meat he received from the forty-five elk made an additional appraisal unnecessary, because the value of the meat was less than the amount the Department paid him. Mr. Carmack argues that the trial court's holding ignores the statutory appraisal procedure which the Department was required to follow in compensating him for the slaughtered elk.

Mr. Carmack received $750 per head for the forty-five elk slaughtered. This amount was set and paid while § 267.610, RSMo Cum.Supp.1993, was in effect. Section 267.610.1, RSMo Cum.Supp.1993, provided, in pertinent part, that the Department indemnify the animals, livestock or birds in an amount "within the limits of appropriation, at a rate fixed by rule or

regulation promulgated by the director of the department of agriculture[.]" The state veterinarian testified that the Department determined that $750 per elk was appropriate in this case because that was the maximum amount ever paid for cattle infected with bovine tuberculosis, the same strain of tuberculosis to which the Carmack elk had become exposed.

The Supreme Court found the bill which included the 1993 amendments to § 267.610, RSMo Supp.1993, unconstitutional, however.[3] *Carmack*, 945 S.W.2d at 961. Generally, an unconstitutional statute is void *ab initio*, except in situations in which injustice occurs as a result of a party's good faith compliance with the unconstitutional statute. *State ex rel. Public Defender Comm'n v. County Court of Greene County*, 667 S.W.2d 409, 413 (Mo. banc 1984). The parties do not contend, and this court does not discern, that the exception applies to this case. Therefore, the 1986 version of § 267.610 applies to the indemnification of the Carmack elk.[4] Section 267.610.2 sets forth, in pertinent part, the following appraisal procedure:

> The appraisal of such livestock, animals or birds shall be made jointly by the owner and a representative of the director of agriculture or by the owner and a representative of the United States Department of Agriculture when the federal government shall elect to participate. In the case of any disagreement a disinterested third party shall be called in and a majority decision as to

the appraisal of such livestock shall be fixed.

\* \* \*

This procedure was not followed with regard to the forty-five elk slaughtered which are the subject of this appeal. While the state veterinarian did testify at trial that it was his opinion that the actual value of the forty-five elk, taking into consideration the fact that the elk were exposed to or infected with tuberculosis, would be their meat value, Mr. Carmack did not offer an appraisal of the actual value of the forty-five elk which considered their diseased status. Mr. Carmack's testimony at trial that he received $3 to $5 per pound for the portion he sold of the 3,000 pounds of meat from the slaughtered elk cannot be taken as a judicial admission of his appraisal of the diseased elk's actual value under § 267.610.2, in light of the fact that Mr. Carmack's position throughout the trial was that the actual value of the elk should not take into consideration the elk's diseased status. *See May v. May*, 294 S.W.2d 627, 633–34 (Mo.App.1956). In addition, the trial court's valuation did not consider evidence that seven of the elk slaughtered had calves in utero, which might have value. Mr. Carmack testified that if the four female and three male calves were separated from their mothers at birth and bottle-fed, they would not be considered exposed to tuberculosis. It is apparent from the record that the parties

---

3. In his second point, Mr. Carmack alleges error in the trial court's conclusion of law which states: "The Department cannot be faulted for setting an indemnity amount for Carmack's elk under § 267.610, RSMo [Cum.] Supp.1993, because that was the version in effect at the time the indemnity was set and paid." Whether the Department can be "faulted" for following a statute later declared unconstitutional is irrelevant. Because a finding of "fault" is immaterial to this court's decision, Mr. Carmack's point on this issue will not be addressed.

4. This court notes that following the Supreme Court's holding that the bill which included

the 1993 amendments to § 267.610 was unconstitutional, § 267.610 was repealed, and a new statute was enacted in 1999. The current statute governing compensation for the slaughter of animals, birds, and livestock exposed to or infected with a highly contagious, communicable or infectious disease, § 267.611, RSMo Cum.Supp.1999, provides for indemnification in an amount "within the limits of appropriation, at a rate fixed by the director of the department of agriculture[.]" This new statute does not apply to this case, as it was enacted well after the slaughter of the forty-five elk.

have not jointly appraised the actual value of the elk as exposed to or infected with the disease, giving due consideration to the elk's breeding, dairy or meat value, as required by the statute. While the $33,750 the Department paid Mr. Carmack for the elk may be in excess of their actual value, Mr. Carmack has a right to require the Department to follow the appraisal procedure of the statute.

Because the procedure as set forth in § 267.610 for appraising the actual value of the elk exposed to or infected with tuberculosis was not followed, the trial court erred in declaring an actual value. The judgment of the trial court is, therefore, reversed, and the cause is remanded to the trial court. On remand, the trial court is directed to enter a judgment declaring that the parties are to appraise the actual value of the forty-five elk exposed to or infected with tuberculosis, giving due consideration to the elk's breeding, dairy or meat value. If the parties disagree, a disinterested third party should be called in and a majority decision as to the appraisal of the actual value of the elk should be fixed.

### Unnecessary to Decide Appeal of Refusal to Grant Writ of Mandamus

Finally, in his first point, Mr. Carmack appeals the trial court's refusal to grant his request for a writ of mandamus. In his request for a writ of mandamus, Mr. Carmack asked the court to order the Department to follow the appraisal procedure set forth in § 267.610. Since this relief was granted when this court reversed the trial court's judgment and remanded the cause, we need not address this point.

The judgment of the trial court is affirmed, in part, and reversed, in part, and the cause is remanded.

All concur.